## WALLACE et al. v. GERLACH et al.
### (No. 1409.)

(Court of Civil Appeals of Texas. El Paso.
March 15, 1923. Rehearing Denied
April 5, 1923.)

1. Carriers ⨁⟾228(5)—Evidence held to show negligent delay in transportation of cattle.

Evidence *held* to show negligence in the transportation of cattle caused by unnecessary delays resulting in failure to deliver them at their destination within a reasonable time.

2. Carriers ⨁⟾230(3)—Evidence held call for submission of an issue as to shrinkage in a delayed shipment of cattle.

In an action for delay in a shipment of cattle, evidence *held* to call for submission of an issue as to excess in shrinkage.

Appeal from District Court, Hudspeth County; W. D. Howe, Judge.

Action by George Gerlach and others against Charles L. Wallace and others, receivers. There was a verdict for plaintiffs, and a motion for new trial was overruled, and defendants appeal. Affirmed.

Jno. B. Howard, of Pecos, for appellants.
Croom, Goldstein & Croom, of El Paso, for appellees.

WALTHALL, J. This suit was brought by George Gerlach, J. J. Gerlach, C. R. White, and J. E. Kramer, copartners, doing business under the name of Gerlach-White-Kramer Cattle Company, against Charles L. Wallace and J. L. Lancaster, receivers of the Texas & Pacific Railway Company, alleging that they sustained damages in the shipment of 251 head of cattle from Colorado, Tex., to El Paso, Tex., by reason of negligence on the part of appellants in failing to transport and deliver the cattle within a reasonable time. The petition alleged that the shipment was made upon a written contract of carriage, the usual and customary bill of lading, and that appellant breached its terms in that they failed to transport and deliver the cattle with reasonable diligence, speed, and dispatch, and that the delivery of the cattle was delayed beyond the usual and customary time required for their transportation from the point of origin of the shipment to the point of destination, alleging the usual and customary time required, and the time actually consumed. It is alleged that by reason of the delays in transportation they sustained damage by shrinkage and loss in weight. They allege the amount the cattle would have been worth on the market in El Paso had they been transported and delivered within a reasonable time, and their value on the El Paso market in their condition as actually delivered, and alleged the actual damages sustained to be $1,223.62, for which they sue.

Appellants answered by general and special exceptions, general denial, admitted the shipment, pleaded the shipment contract, and, specially, that portion providing that the cattle were not to be transported at any particular speed, not within any specified time, nor to be delivered at destination at any particular hour, nor for any particular market; alleged that the shipment was made in the usual and customary time, with ordinary speed and dispatch, denied unnecessary delays, and denied any injury to the cattle.

The case was tried with a jury, and submitted upon the general issue. The jury returned a verdict for appellees, and assessed their damages at $1,223.62, the amount sued for, and for which judgment was entered. Appellants duly filed a motion for a new trial, which the court overruled, to which exception was noted, and notice of appeal given.

### Opinion.

Under the first and fourth propositions appellants insist that, the cause of action being based upon shrinkage of the cattle caused by negligent delays, it devolved upon the shippers to show that the delays were negligent and unnecessary in the operation of the train transporting the cattle, and on a failure to show such negligence the court should have instructed the verdict for appellants; and the second proposition is to the effect that the uncontroverted evidence shows that the movements of the train were only usual and ordinary delays incident to its operation.

[1] The effect of the above propositions is to challenge the sufficiency of the evidence to show negligence of appellants in the transportation of the cattle caused by unnecessary delays, resulting in a failure to deliver the cattle at their destination within a reasonable time, as submitted by the court in the general charge and the one special charge given. The facts shown by the evidence are substantially as follows:

One of the appellees, C. R. White, was in charge of the shipment of the cattle. The cattle were being held near Colorado, Tex., for shipment to El Paso, Tex. On the day before the shipment White called the chief dispatcher and advised him of the intended shipment, and that the cattle were sold to be weighed off the cars at El Paso, and that he wanted a through train, and would load them on an hour's notice. The cattle were loaded at Colorado on the 3d of April, 1921, about 11:30 a. m., White accompanying the shipment. The cattle were four year old steers, fat and in good shipping condition. They were 251 in number, and were loaded in 10 cars. The loading occupied about 1½

hours. The first stop of any consequence was at Monahans. The cattle were held at Monahans about 2 hours and 35 minutes to load some 15 water cars. The water cars were carried from Monahans with the cattle train. The shipment was held at Toyah between 3 and 4 hours. The delay at Toyah was caused on account of having to take the water out of the water cars brought from Monahans, and put the water in an engine and heat the engine up to bring the train on. At the station Torcer a bridge was taken out in front of the train, and the train delayed there 1 hour and 45 minutes. The delay at Torcer caused the cattle train to be sidetracked for east-bound trains to pass, for about 45 minutes. The cattle train arrived at the freight-yards in El Paso at about 10:30 on the night of April 4th. The cattle were to be delivered at the Morris yards in the city of El Paso. The cattle train reached the Morris yards about 11 o'clock on the night of April 4th. The cars were spotted for unloading three hours after they reached the Morris yards. On the first spotting only 3 or 4 of the cars could be unloaded on account of one car being a 40-foot car. That necessitated a respotting before the other cars could be unloaded. Mansfield, in charge of the unloading of the cattle, testified on account of the failure to spot all of the cars he had to get the train crew back. He rang up the yardmaster and advised him of the situation. The yardmaster contended that the cars were spotted; that the train crew had gone to get supper and had to make up a fruit train before coming back. After calling repeatedly, and after a delay of between 3 or 4 hours the cars were again spotted and the cattle unloaded. The customary time for unloading was from 40 to 60 minutes. At the time the cattle were unloaded they were drawn and showed a big shrinkage, and, as the witness stated, "were dying for water." The usual run between Colorado and El Paso is from 24 to 26 hours. The time occupied in this shipment appears to be about 37 hours.

The jury passed upon the question of whether the delays were reasonable and unavoidable. The evidence we think, sustains their finding. The court was not in error in refusing to instruct the jury in favor of appellants.

[2] The third proposition insists that there is no evidence of loss by shrinkage, or what shrinkage the cattle suffered, except the speculative loss by shrinkage based upon a comparative shipment previously made by the same parties between the same points. On this issue C. R. White, one of appellees, after qualifying as an experienced shipper of cattle, testified:

"From my experience as a cattle man I can say that these cattle weighed 1,100 pounds at the time I delivered them to the Texas & Pacific at Colorado. * * * The usual and customary shrinkage of those cattle would be about 30 or 35 pounds, in my opinion. That is, if they had the customary run I speak about. * * * They weighed, in my judgment, 1,100 pounds when I shipped them. When I sold them at El Paso they weighed 1,009 pounds, a shrinkage of 91 pounds. In my opinion the cause of that shrinkage was holding them on the cars so long. Another thing, the stops is what shrunk them. I would rather run cattle 6 or 7 hours than stand them 2. If they are running they don't shrink much, but if they are standing, as soon as they stop they commence to jam each other and shrink. * * * In my opinion cattle suffer damage by being loaded on cars more than 24 or 26 hours, because of shrinkage."

The witness was permitted to testify as to the shrinkage in a shipment of the same kind and class of cattle, from the same pens, and between the same points, about two weeks prior to the shipment here. The evidence was that these cattle should have gained about 3 pounds per day during the two weeks over the previous shipment; that there was no difference in the physical and natural conditions of the cattle in the two shipments. The prior shipment took 24 hours in transit. When they arrived in El Paso they weighed 1,074 pounds, while these cattle weighed 1,009 pounds.

Mansfield, who saw the cattle, had them unloaded, and weighed them off the cars, testified that the shrinkage on these cattle would be about 35 or 40 pounds.

W. L. Amonett, after qualifying, testified that the minimum shrinkage of this class of cattle would be 40 or 50 pounds on a distance of 400 miles run.

A number of witnesses to whose evidence we have not referred testified to the facts involved here. Some of them are in explanation of the delays in transit.

We think the evidence is sufficient to call for the submission of the issue of excess in the shrinkage in weight of the cattle, and the amount found is within the limits of the pleadings and evidence.

Finding no reversible error, the case is affirmed.